

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00054-CR

DALTON DALE ROGERS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 19156

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

After a jury found Dalton Dale Rogers guilty of possession of a controlled substance, four grams or more but less than 200 grams, the trial court[1] sentenced him to twenty-eight years in prison and assessed $365.00 in court costs and a fine in the amount of $5,000.00.[2]  Rogers appeals, maintaining that (1) the trial court erred when it allowed the State to introduce extraneous-offense evidence during the guilt/innocence phase of the trial in violation of Rules 403 and 404(b) of the Texas Rules of Evidence, (2) he was harmed by the admission of the extraneous-offense evidence, and (3) the judgment of conviction should be reformed to accurately reflect the correct degree of offense.  We find that the trial court did not err when it allowed the State to introduce extraneous-offense evidence.  Even so, we must modify the trial court's judgment to correct the degree of offense.  As modified, we affirm the trial court's judgment of conviction.

## I.      Background

Justin Nustad, a member of a special investigations unit[3] for the Upshur County Sheriff's Office and the handler of a drug dog named Marco, testified that Marco was certified in locating methamphetamine, heroin, ecstasy, cocaine, and crack cocaine.  To be Marco's handler, Nustad was required to participate in specialized training to learn how to communicate with Marco.  On

---

[1]This case was originally appealed to the Twelfth Court of Appeals in Tyler.  It was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.  *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.).  We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue.  *See* TEX. R. APP. P. 41.3.

[2]Rogers pled true to one enhancement paragraph.

[3]Specifically, Nustad was assigned to the Narcotics Intervention and Detection Unit.

August 3, 2020, Nustad was working drug interdiction, which basically meant that he sat and watched "for activity, vehicle traffic." That night, a driver drove past Nustad in a vehicle that did not have a working license plate light. Nustad activated his emergency lights and attempted to stop the vehicle. Although the driver did not stop immediately, when he did, he quickly exited his vehicle, closed the door behind him, and began walking toward Nustad. Nustad said that he was familiar with the driver and knew him to be Rogers. According to Nustad, Rogers attempted to distance himself from the vehicle so that Nustad could not see or smell what was inside of it. Rogers was the sole person in the vehicle.

Pursuant to existing warrants, Nustad arrested Rogers for failure to maintain financial responsibility, failure to display a driver's license, and displaying an expired registration. Based on those arrests, Nustad asked Rogers if he would consent to a search of his vehicle. Rogers denied consent, but he told Nustad that he would allow Marco to do a free-air search of the vehicle. Marco made a positive alert for the existence of drugs in the driver's-side quarter panel of the truck. Specifically, the drugs were found "in the window mechanism where you roll your windows up and down, the whole panel basically was loose." Nustad said that he simply "stuck [his] finger in there and just popped it open." Nustad then "shined [his] light down there and immediately could see [the drugs]." According to Nustad, Rogers's vehicle contained a large amount of methamphetamine, which was, in his opinion, well beyond an individual-user amount.[4] Nustad also found a bag containing Xanax on the top of the methamphetamine and a

---

[4]The methamphetamine weighed 11.39 grams.

3

hypodermic syringe.[5] Nustad explained that methamphetamine could be used in a variety of ways, including by injecting it into a body part with the aid of a syringe. Although Rogers conceded that the truck belonged to him, he told Nustad that he did not know anything about the drugs that were found in his truck.

After hearing from several more witnesses, the jury found Rogers guilty of possession of a controlled substance, more than four grams but less than 200 grams. He was sentenced to twenty-eight years' imprisonment and assessed court costs and a fine. This appeal followed.

## II. The Trial Court Did Not Err When it Admitted Extraneous-Offense Evidence

Rogers appeals, maintaining (1) that the trial court erred when it allowed the State to introduce extraneous-offense evidence during the guilt/innocence phase of the trial in violation of Rules 403 and 404(b) of the Texas Rules of Evidence, (2) that he was harmed by the admission of the extraneous-offense evidence, and (3) that the judgment of conviction should be reformed to accurately reflect the correct degree of offense.

### A. The Extraneous Offenses

At trial, the State offered, and the trial court admitted, two extraneous offenses that Rogers objected to at trial and now complains of on appeal. The first offense was alleged to have occurred on December 21, 2010. John Beasley, an investigator with the Mount Pleasant Police Department,[6] testified that Mr. Lopez, a loss-prevention officer at the Walmart in Gilmer, contacted him about potential narcotics activity at the store. When Beasley arrived at Walmart,

---

[5]Rogers claimed that the syringe belonged to a diabetic friend of his.

[6]In December 2010, Beasley was assigned to the narcotics unit of the Upshur County Sheriff's Office.

Lopez told him about Rogers's interest in purchasing pseudoephedrine. Pursuant to that information, Beasley struck up a conversation with Rogers, who ultimately offered to sell Rogers marihuana, Xanax, or hydrocodone in exchange for Beasley purchasing pseudoephedrine for him from Walmart.[7] After Beasley purchased the pseudoephedrine, he met Rogers in the parking lot to complete the transaction. At that point, Rogers was arrested for delivery of a controlled substance or offer to deliver a controlled substance. During a search of Rogers's person, officers located Xanax and a hypodermic needle. Rogers claimed that he had a prescription for Xanax. In 2011, a jury found Rogers guilty, and the trial court sentenced him to the maximum punishment.

Beasley also explained that there are laws in the State of Texas that place limits on the amount of pseudoephedrine a person can buy from a store. To get around those laws, it was common for an individual to purchase pseudoephedrine for another individual so that they could manufacture methamphetamine. Beasley believed that Rogers needed pseudoephedrine for that reason.

Nustad testified about the second extraneous offense (trial court cause number 19179), which was alleged to have occurred approximately one year after the offense occurred in this case. In cause 19179, Rogers was driving a U-Haul rental truck when Nustad and his partner stopped Rogers based on a traffic violation.[8] At that time, there was an outstanding warrant for Rogers related to another offense. Rogers would not give the officers consent to search the

---

[7]While Beasley and Rogers were talking inside the store, Rogers showed Beasley some marihuana and told him that he had Xanax and hydrocodone.

[8]Rogers was the sole occupant in the vehicle.

5

vehicle, so Marco was instructed to do a free-air search. Marco alerted to the presence of drugs in the driver's side door of the vehicle. When the vehicle was searched, the officers located almost fifteen grams of methamphetamine next to Rogers's person.[9] They also found a methamphetamine pipe in between the driver's seat and the center console of the vehicle. Rogers denied knowing anything about the presence of the methamphetamine in the truck. The State indicted Rogers for the first-degree-felony offense of possession of a controlled substance, specifically, methamphetamine. At the time of trial in the pending case, the trial in cause 19179 had not taken place.

## B. Discussion

Rogers maintains that the trial court erred when it allowed the State to present extraneous-offense evidence, arguing that it related only to his propensity to possess methamphetamine, to sell drugs, and to manufacture methamphetamine. According to Rogers, "[t]he State had no need or reason to introduce the evidence, and the timing—at the beginning of trial—supports that such evidence should not have been admitted." Furthermore, he contends that the State's use of the extraneous-offense evidence was not necessary for rebuttal purposes because Rogers did not offer a defense theory.

The State argues that, during voir dire, and then later during trial, Rogers maintained that "one cannot possess with 'care, custody, and control,' a controlled substance if one had no knowledge of the presence of the controlled substance." According to the State, Rogers provided the jury panel with examples regarding the issue of intent, i.e., that a person who did not have

---

[9]According to Nustad, almost fifteen grams of methamphetamine was a dealer amount of drugs as opposed to a user amount.

6

knowledge of the presence of a controlled substance could not have the intent to possess it. The

State also maintains that Rogers "opened the door" with those examples, which allowed the State

to offer the extraneous offenses for the purpose of proving intent and knowledge. Moreover, the

State argues that, during trial, Rogers raised the issue of ownership and registration of the vehicle

that he was driving, thereby implying that he could not have known what was inside the vehicle.

A trial court's ruling on the admissibility of extraneous-offense evidence is reviewed for

an abuse of discretion. *See Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990).

An appellate court must uphold a trial court's ruling if it is reasonably supported by the record

and is correct under any theory of law applicable to the case. *See id.* "An appellate court will

not reverse a trial court's ruling [to admit evidence] unless that ruling falls outside the zone of

reasonable disagreement." *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001). The

Texas Court of Criminal Appeals has explained that

> [a] trial court's ruling is generally within th[e] zone if the evidence shows that
> 1) an extraneous transaction is relevant to a material, non-propensity issue, and
> 2) the probative value of that evidence is not substantially outweighed by the
> danger of unfair prejudice, confusion of the issues, or misleading of the jury.
> Furthermore, if the trial court's evidentiary ruling is correct on any theory of law
> applicable to that ruling, it will not be disturbed even if the trial judge gave the
> wrong reason for his right ruling.

*De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009) (footnote omitted) (citation

omitted). All relevant evidence is admissible unless it is excluded by law. TEX. R. EVID. 402.

"Evidence is relevant if . . . it has any tendency to make" the existence of any "fact [that] is of

consequence [to the] determination of the action" "more or less probable than it would be

without the evidence." TEX. R. EVID. 401.

Further, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." TEX. R. EVID. 404(a)(1). However,

> [t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On timely request by a defendant in a criminal case, the prosecutor must provide reasonable notice before trial that the prosecution intends to introduce such evidence—other than that arising in the same transaction—in its case-in-chief.

TEX. R. EVID. 404(b)(2); *see Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). "The exceptions listed under Rule 404(b) are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343. "Rule 404(b) is a rule of inclusion rather than exclusion." *Id.* (quoting *United States v. Bowie*, 232 F.2d 923, 929 (D.C. Cir. 2000)). "The rule excludes only that evidence that is offered (or will be used) *solely* for the purpose of proving bad character and hence conduct in conformity with that bad character." *Id.* (emphasis added).

But, when a defendant raises a defensive theory, he "opens the door" for the State to offer rebuttal evidence regarding an extraneous offense if the extraneous offense has characteristics common with the offense for which the defendant was on trial. *Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016). Simply stated, "As a general proposition, when a party introduces matters into evidence, he invites the other side to reply to that evidence." *Wheeler v. State*, 67 S.W.3d 879, 885 n.13 (Tex. Crim. App. 2022) (citing *Kincaid v. State*, 534 S.W.2d 340, 342 (Tex. Crim. App. 1976). In *Dabney*, the Texas Court of Criminal Appeals held "that [a] defensive theory raised in voir dire and opening statements open[s] the door to . . . extraneous-

8

offense evidence presented by the State and the State [is] not required under Rule 404(b) to provide notice of such rebuttal evidence." *Dabney*, 492 S.W.3d at 318.

Rogers maintains that the State had no need to introduce the extraneous offenses before Rogers presented a defensive theory, if, in fact, he presented one.

However, a review of the record shows that, during jury selection, Rogers stated,

> All right. Now, the State, as Mr. Byrd talked about, they have the burden of proof throughout the whole trial. And the things [the State] talked to you about, the care, custody, control, management are going to be crucial in this case. So let's say -- I'll give you another example. Let's say somewhere in this room there's a large quantity of drugs. Let's say everyone in here is charged. Well, if you personally were charged because there were drugs in this room you would want the State -- and you're in front of a jury like this -- the State would have to prove that you personally had one of those things, either care, custody, or control of those drugs. Does everybody understand that, to be found guilty. But let's say you're in a bus, and maybe just five of y'all are in there, the same things. It gets pulled over, everyone gets charged with it, well, still the State would have the burden of proving that those particular drugs were under your care, custody, control, or management.
>
> Now, that burden didn't shift to you. You don't have to come up and prove or -- the defendant wouldn't have to come up and prove they weren't yours, it's the State's burden. Does anybody think that that burden that's placed on the State is unfair, that it should be the defendant to come up and prove it wasn't his drugs? Anybody feel that way?

Rogers continued, "Does everybody understand it's the State's burden? And some people think -- well, and I'm going to get to this -- 'I want to hear the defendant get up and say, "It wasn't mine. This is how I can prove it."'"

Relevant to the issue of whether Rogers knew methamphetamine was in the truck, at trial, Rogers asked Nustad the following:

> Q. Now, the vehicle -- is it your testimony that Mr. Rogers, at the scene, claimed that was his vehicle?

9

A.      Yes.

Q.      Did you run the title to see whose vehicle it actually belonged to?

A.      We did run the registration like we always do when we stop a car. That's the first thing we give out, location and the license plate.  So we did.

Q.      Okay.  And isn't it true it did not actually belong to Mr. Rogers; is that accurate?

A.      I don't have a copy of the face sheet, just the report.  I don't remember.

Q.      Now, you're the -- was there an investigator assigned to this offense or was it pretty much just you and Mr. Lambert there on the scene and that was it?

A.      Basically we are the investigators for narcotic crimes, yes, sir.

Q.      Now, would the ownership, the title of that vehicle be important as far as if you're finding drugs in different places?

A.      No.

Q.      No?

A.      I mean, we find drugs all the time in cars that are not registered to the person driving it.

Q.      So it's not relevant to you whether he actually owned the vehicle or not?

A.      No, sir.

Q.      Would it be relevant if somebody else had been using the car prior to that day?

A.      He didn't mention that.

Q.      Did you ask him who else had been driving this car?

10

A.      I think I did, but I don't remember.  I can't tell you.

Q.      You agree with me, that would be important, correct?

A.      Yes, sir.

Q.      It would also be important actually who owned the car, correct?

A.      Honestly, I disagree with you.  I don't believe that.

Q.      Okay.  But as you sit here today, you don't know who actually owned it?

A.      No, I don't.  I mean, he said it was his car, so I'm assuming he was the owner of it.

Q.      All right.

On recross-examination, Rogers continued questioning Nustad.

Q.      . . . . The location of the drugs found, at least on August 3rd, that was inside the door panel, literally you had to pull up the --

A.      The window mechanism.

Q.      Yes.  The window mechanism -- that little panel, you had to pull out the side armrest to find the drugs inside, correct?

A.      Yes.

Q.      All right.  Was there any other investigative methods that could have been used to maybe tie what was in that location to Mr. Rogers? . . .

In addition to Nustad's testimony, Chris Lambert, an investigator with the Upshur County Sheriff's Office, testified that he was working with Nustad when Rogers was pulled over for a traffic violation.  Rogers questioned Lambert as follows:

Q.      Sure.  Now, when you called dispatch that night, isn't it true this car wasn't registered to Mr. Rogers?

A.     Correct.

Q.     Do you know who it was registered to?

A.     I don't recall the registered owner [sic] name, no, sir.

Lastly, in his closing argument, Rogers stated,

So what I argue to you is the care, custody, and control.  Did the State meet their burden in proving care, custody, and control?  Did they prove that Mr. Rogers knew that those drugs were inside the door of his car?  Did they prove that it was his car?  They didn't have to prove that, but did they bring any evidence of whose car it was?

Ladies and gentlemen, I will suggest to you as investigators, it's their burden of bringing this evidence to you and proving who owned that methamphetamine, the drugs, that's before us today.  If you remember on cross-examination I questioned him about certain things.  What was in the car?  Who owned the car?  Did you determine who owned the car?  Did you determine who it was registered to?  All those things were important to them because in their opinion they found the meth, Mr. Rogers was driving the car, it had to be his.  And that's where the investigation ended.  But as we all know, sometimes we drive other people's cars.  There's a lot of stuff in the car.  There was nothing linking him individually to not only the things in the car, but the stuff that was inside the door, for what admittedly they testified was not his vehicle.  And ladies and gentlemen, that at least brings some doubt into whether or not he had care, custody, control, and management of something that was in the car that didn't even belong to him.  And, ladies and gentlemen, I would submit to you that it at least raises some doubt, some reasonable doubt that cannot be removed.

From jury selection to closing arguments, Rogers put forth a defensive theory (1) that the truck did not belong to him, (2) that he was not aware of the existence of the methamphetamine in the truck, and (3) that he did not knowingly possess methamphetamine.  In jury selection, he stated, "You don't have to come up and prove or -- the defendant wouldn't have to come up and prove [the drugs] weren't yours, it's the State's burden.  Does anybody think that that burden that's placed on the State is unfair, that it should be the defendant to come up and prove it wasn't

12

his drugs?" The same is true of his questions during trial and the statements he made in his closing argument. Because Rogers opened the door to the issues of possession, ownership, and intent, the State was allowed to offer evidence in the form of the two extraneous offenses to rebut Rogers's defensive theory. Notably, there were several factors in the prior offenses that were common to the offense at issue here and that corroborated the witnesses' testimony given in this case. In the Walmart case, Rogers asked Beasley if he would buy pseudoephedrine for him in exchange for other drugs. Clearly, that transaction showed that Rogers had possession of various drugs that he was willing to sell or trade. That fact corroborates Nustad's testimony that he believed Rogers was in possession of a dealer amount of drugs in the instant case, rather than a user amount. According to Beasley's testimony, many people in Upshur County used pseudoephedrine to manufacture methamphetamine, which just happened to be the type of drug Rogers was in possession of in this case. And, similar to the instant case, when officers searched Rogers's person and his vehicle, they located a hypodermic syringe and Xanax.

Further, Rogers was the only person in the vehicle in cause 19179, and he was the only person in the vehicle in the instant case. In both cases, he denied knowing of the existence of the drugs in the vehicle. In both cases, Rogers was driving a vehicle that did not belong to him. Likewise, in both instances he did not give consent to search the vehicle, and the drugs were found in similar places—the driver's side of the vehicle. Moreover, in both instances, Rogers was in possession of a dealer amount of methamphetamine, not a user amount.

Rule 404 allowed the State to offer the extraneous-offense evidence to prove knowledge, absence of mistake, and intent in the pending case. Based on these common characteristics, this

13

Court cannot say that the prior extraneous offenses were used "solely for the purpose of proving [Rogers's] bad character." *De La Paz*, 279 S.W.3d at 343. Accordingly, the trial court did not violate Rule 404(b) when it admitted the State's extraneous-offense evidence.

Next, Rogers claims that the trial court's admission of extraneous-offense evidence violated Rule 403 because its probative value was outweighed by the danger of unfair prejudice. When conducting a Rule 403 balancing test, we

> must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Price v. State*, 594 S.W.3d 674, 680 (Tex. App.—Texarkana 2019, no pet.) (quoting *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)). "In any given case, 'these factors may well blend together in practice.'" *Id.* (quoting *Gigliobianco*, 210 S.W.3d at 642).

Here, we find that the first factor favors the admission of the extraneous-offense evidence in light of its relevance to Rogers's claims that he had no knowledge of the existence of methamphetamine in the vehicle and that he did not knowingly possess the methamphetamine, both of which are related to elements that the State was required to prove. Also, the extraneous-offense evidence made a fact of consequence—the falsity of Rogers's position that he knew nothing about the drugs and his knowledge that he did—more likely. Furthermore, the evidence that Rogers committed the extraneous offenses was compelling. In the two extraneous offenses,

14

drugs were found in Roger's possession or within his reach. Moreover, Rogers's knowledge of the methamphetamine's existence was a hotly contested issue at trial; consequently, the extraneous-offense evidence had very high probative value in showing that he did have knowledge of the drugs. Clearly, a significant amount of time was devoted to the presentation of the extraneous-offense evidence. Yet, Rogers argues on appeal that the State had no reason to introduce the evidence because "there was no defensive theory to rebut." The record shows differently. As previously stated, Rogers put forth his defensive theory as early as jury selection, and he continued with it up to, and including, his closing argument. Lastly, the elements of intent and knowledge can sometimes be difficult for the State to prove when there are no additional witnesses to the alleged offense. Here, the admission of the extraneous-offense evidence was necessary for the State to show that Rogers had (1) intent to possess a large amount of methamphetamine, (2) that he had knowledge of the existence of the methamphetamine in the truck, and (3) that it was not the first time that Rogers denied having the intent to possess or the knowledge that he was in possession of methamphetamine.

In light of those facts, we find that the trial court did not abuse its discretion when it found that the danger of unfair prejudice did not substantially outweigh the probative value of the extraneous offenses.

We overrule Rogers's first point of error.[10]

---

[10]Because we find that the trial court did not err when it admitted the extraneous-offense evidence, it is not necessary for us to address Rogers's second point of error, that is, his claim that he was harmed by the admission of the evidence.

15

### III.    The Judgment Must be Modified to Show the Correct Degree of Offense

In his third point of error, Rogers maintains that the trial court's judgment should be reformed to reflect the correct degree of felony offense.[11]  Specifically, the State charged Rogers with the offense of possession of a controlled substance, four grams or more but less than 200 grams, which is a felony of the second degree.  *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(d) (Supp.).  The indictment included an enhancement paragraph that contained a prior felony conviction, which raised the range of Rogers's potential punishment to that of a first-degree felony but did not change the felony degree of offense itself.[12]  Despite that, the judgment of conviction shows that Rogers was convicted of a first-degree felony.

"Appellate courts 'have the authority to reform judgments and affirm as modified in cases where there is non reversible error.'"  *Walker v. State*, 557 S.W.3d 678, 690 (Tex. App.—Texarkana 2018, pet. ref'd) (quoting *Ferguson v. State*, 435 S.W.3d 291, 293 (Tex. App.—Waco 2014, pet. struck), *overruled on other grounds by Cummins v. State*, 646 S.W.3d 605 (Tex. App.—Waco 2022, pet. ref'd); *see Anthony v. State*, 531 S.W.3d 739, 743 (Tex. App.—Texarkana 2016, no pet.) ("This Court has the power to correct and modify the judgment of the trial court for accuracy when the necessary data and information are part of the record.") (citing TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd)).

---

[11]The State agrees with Rogers's request to reform the judgment to reflect the correct degree of felony offense.

[12]The relevant enhancement statute states that, "if it is shown on the trial of a felony of the second degree that the defendant has previously been finally convicted of a felony other than a state jail felony punishable under Section 12.35(a), on conviction the defendant shall be punished for a felony of the first degree."  TEX. PENAL CODE ANN. § 12.42(b).  Here, Rogers pled true to one enhancement paragraph, resulting in an enhanced sentence.  Section 12.42, however, does not speak to a change in the degree of offense.

Because Rogers was tried and convicted of the second-degree-felony offense of possession of a controlled substance, four grams or more but less than 200 grams, we sustain Rogers's third point of error and must modify the judgment to reflect conviction of a second-degree felony.

## IV.     Disposition

Accordingly, we modify the judgment of conviction to reflect that Rogers was convicted of a second-degree felony.  As modified, we affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:     October 3, 2023
Date Decided:       November 15, 2023

Do Not Publish