**Philip DeMARCO, Libellant,**

v.

**UNITED STATES of America,**
**Respondent,**

and

**American Stevedores, Inc., Respondent-Impleaded.**

**No. 20707.**

United States District Court
E. D. New York.
April 5, 1962.

Lawrence M. Honig, New York City (Edward A. Bohan, New York City, of counsel), for libellant.

Lieut. Commdr. G. M. Bates (Joseph P. Hoey, U. S. Atty., Louis E. Greco, Admiralty and Shipping Section, Department of Justice, of counsel), for respondent.

Michael J. Kenny, New York City (George J. Conway, New York City, of counsel), for respondent-impleaded.

DOOLING, District Judge.

Libellant, a marine carpenter employed by American Stevedores, Inc., sued to recover for personal injuries he suffered when he fainted and fell while working in the No. 5 lower hold of respondent's public vessel, the USNS Alexander M. Patch. The facts have been separately found and will not be detailed here.

It has been found that libellant and other marine carpenters, together with longshoremen, all employed by American Stevedores, Inc., were loading cargo transporters ("conex boxes") to the No. 5 lower hold of the Patch at the Brooklyn Army Base on September 14, 1956. As was not unusual, a gasoline-motored forklift truck, owned by American Stevedores, Inc., was being used to move the conex boxes (measuring nearly seven feet by nine feet by six feet) into the wings of the hold. The day was hot, the work in the hold was going forward fifty feet below the No. 5 hatch coaming on the upper deck, the ventilators were not operating in the hold and no portable blowers were in use. There were twenty or more men working in the lower hold and the forklift operated pretty continuously. Complaints of excessive fumes and of the failure to have the ventilation system working were made as early as 10:30 or 11:00 in the morning and repeated through the day by the men in the hold; it is apparent that nothing was done to start up the ventilation system. Some time between 3:00 and 4:00 in the afternoon libellant was carrying a sawn length of lumber along a four foot wide access tunnel raised two feet above deck level when he fainted, fell to the deck and sustained injuries. He fainted because of the foul air in the hold.

Libellant charges respondent with negligence and its ship with unseaworthiness; respondent, denying both charges, claims over against the stevedore on an express indemnification contained in the contract between respondent and the stevedore, American Stevedores, Inc.

The facts, on nearly every aspect of the case, were contested. Without reviewing the evidence, it may be said that respondent's evidence of a total absence of any recorded or recollected complaint about the ventilation system or about libellant's accident does not outweigh the sworn testimony of libellant and his, doubtless, sympathetic fellow workers and the uncompromising fact that the accident did befall libellant and should have been—and was not—on respondent's own evidence of ship's practice, recorded in the ordinary course of ship's business in one or another log. It is somewhat difficult for essentially negative evidence to survive such a demonstration of a gap in the grid of its negation however real the possibility of error in the opposing evidence.

The ventilation system of the No. 5 lower hold was not meant to ventilate it sufficiently for men to work in it when the hold was closed as it would be at

sea; the system was for cargo ventilation and the occasional presence of personnel checking cargo at sea through the access tunnel without opening the hatch covering. In port, during loading, reliance, implicitly, would be on the uncovered hatch opening in part. Respondent's ventilation expert, who designed the system, had not contemplated use of a gasoline-motored forklift truck ·in the hold during loading operations; had that been in contemplation, he would have designed differently or recommended the use of portable blowers to supplement the installed system. In fact gasoline-motored forklift trucks were used in the holds in loading at the Brooklyn Army Base with a degree of regularity both in the Patch and in other vessels, and everyone at interest knew it—including libellant.

On the day in question the forklift was operating, the ventilation system was not and no supplementary portable blowers were in use. The result was a working atmosphere that provoked steady complaint and the inadequate measure of substituting one forklift for another, on the evident assumption that the particular forklift was at fault. It was not, so far as appears. Yet the atmosphere was not fit for work and work was continued.

Libellant alone fainted. That might suggest an unforeseeable susceptibility on his part but for the evidence that the symptoms that preceded his fainting did not differ in kind from those of his fellow workers and that libellant had no record of proneness to faint. If no one else fainted and fell, that is so much of loss fortunately saved to respondent and not a demonstration that libellant was unequal to an ordinary industrial condition. In fact, libellant's appearance is one of abundant sturdiness.

Since the negligence of respondent toward libellant has been found, unseaworthiness is not indispensable to libellant's recovery. Unseaworthiness was present whether or not the forklift was appurtenant gear, as there are indications some Courts would hold it was (See

Considine v. Black Diamond Steamship Corporation, D.Mass.1958, 163 F.Supp. 109; Reed v. The Yaka, E.D.Pa.1960, 183 F.Supp. 69, particularly at p. 74; DiSalvo v. Cunard Steamship Co., S.D.N. Y.1959, 171 F.Supp. 813; cf. Massa v. C. A. Venezuelan Navagacion, 2d Cir. 1962, 298 F.2d 239. But see, although distinguishable, McKnight v. N. M. Paterson & Sons, Ltd., N.D.Ohio E.D.1960, 181 F.Supp. 434, affd., 6th Cir. 1960, 286 F.2d 250). The successive forklifts here were not shown to be defective. The unseaworthiness was the continuance of the unwholesome working atmosphere in the hold at a time when the ship's business was the loading of that hold and that loading was going forward. Very likely some such concurrence of temperature, number of men at work, closedown of the ventilation system, use of a forklift, absence of portable blowers and reduction of the cube of atmosphere though partial loading was required to produce the result; but there the result lastingly was, and as inherently reproducible as the recurrence of some range of duplications of the conditions that produced it were usual to this port, at which the Patch regularly called, in the summer months—except the close-down of the ventilation system, hardly a circumstance exculpatory of the Patch. Allowing to the Patch its general seaworthiness, its high classification, it was not on this day reasonably suited to the common ship's task of the day that was being carried on in a way common for the task. The deviation from suitability was not narrowly transitory nor such an arguably normal service state in the right use of a generally seaworthy ship as was dealt with in Pinto v. States Marine Corporation, 2d Cir. 1961, 296 F. 2d 1. Whatever portent exists in the present status of Morales v. City of Galveston, certiorari granted 1961, 368 U.S. 816, 82 S.Ct. 104, 7 L.Ed.2d 23, to review 5th Cir. 1961, 291 F.2d 97, augurs nothing favorable to respondent's position (See Morales v. City of Galveston, S.D. Tex.Galv.Div.1959, 181 F.Supp. 202, aff'd. 5th Cir. 1960, 275 F.2d 191, vacat-

ed 1960, 364 U.S. 295, 81 S.Ct. 107, 5 L. Ed.2d 84, to consider in the light of Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941).

On the findings as to the negligence of respondent-impleaded, its liability to respondent follows under the express contractual indemnification outlining the limited and inapplicable circumstances in which respondent's own fault discharges the duty to indemnify (See Santomarco v. United States, 2d Cir. 1960, 277 F.2d 255; Drago v. A/S Inger, E.D. N.Y.1961, 194 F.Supp. 398).